IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

STEVEN TURNER,
   *Plaintiff*,

v.

ARCHER WESTERN CONTRACTORS,
LLC
   *Defendant*.[1]

Civil Action No. ELH-17-2228

**MEMORANDUM OPINION**

In this tort suit, plaintiff Steven Turner, who is self-represented, filed suit in the Circuit Court for Baltimore City against defendant Archer Western Contractors, LLC ("Archer Western"), a private construction contractor. ECF 2 ("Complaint")[2]; *see also* ECF 64-1 at 15 (claim denial from City of Baltimore). Turner is an employee of Baltimore City's Department of General Services, Fleet Management Division. ECF 64-1 at 13. At the relevant time, Archer Western was performing work for the City of Baltimore. Defendant timely removed the case to this Court on August 7, 2017, under 28 U.S.C. § 1332, based on diversity jurisdiction. ECF 1; *see also* ECF 25.

In his suit, Turner alleged that Archer Western sprayed "hazardous chemicals" onto Turner's two motor vehicles, which were "on the parking lot at work," damaging their paint. Turner also claims that the hazardous chemicals got on his clothes, hands, skin, and face and

---

   [1] In the Complaint, plaintiff identifies the defendant as "Archer Western Company." ECF 2. But, defendant states that its proper name is Archer Western Contractors, LLC. ECF 1. I shall use defendant's nomenclature.

   [2] Plaintiff also sued Michael Sutton. However, the Complaint did not mention Sutton. *See* ECF 2. Accordingly, Sutton moved to dismiss. ECF 8. I granted the Motion by Memorandum and Order of September 18, 2017. ECF 26; ECF 27.

entered his body. In addition, Turner alleges that his exposure to the chemicals has caused him to sustain various medical ailments. *Id.* at 1. Turner sought $20 million in damages. *Id.*

The Complaint did not contain specific counts. But, I interpreted it as alleging two claims of negligence. *Id.* The first was for the medical problems that plaintiff allegedly sustained. The second was for the property damage to plaintiff's two vehicles. As discussed in more detail, *infra*, I granted defendant's motion for summary judgment as to the medical claim but denied it as to the property claim. *See* ECF 74; ECF 75.

Now pending is Archer Western's "Motion To Enforce Settlement Agreement" (ECF 79), supported by a memorandum (ECF 79-1) (collectively, the "Motion") and multiple exhibits. ECF 79-2 to ECF 79-7. In response, Turner filed correspondence reiterating his desire to be compensated for injuries to his health. ECF 80 at 1. The correspondence was supported by a letter from his physician. *Id.* at 2.

Pursuant to an Order of April 16, 2019 (ECF 81), the Court held a hearing on the Motion on June 7, 2019, at which testimonial and documentary evidence were presented. *See* ECF 83; ECF 84.[3] Aman S. Aulakh, Esq., an associate attorney at the Maryland law office of Mintzer Sarowitz Zeris Ledva & Meyers, LLP ("Mintzer" or the "Firm"), testified as a witness for Archer Western. Turner testified on his own behalf. The Court also heard oral argument from the parties.

For the reasons that follow, I shall grant the Motion.

---

[3] Some of the exhibits submitted at the Motion hearing are duplicates of exhibits submitted in the parties' earlier filings. For the convenience of the reader, and when possible, I will cite to the docket number as it appears on the Court's electronic docket.

## I.   Factual Summary

### A.   Procedural Background

By Order of November 14, 2017 (ECF 35), I referred the case to Magistrate Judge A. David Copperthite for a settlement conference. On January 5, 2018, Judge Copperthite appointed Gretchen Slater as *pro bono* counsel for plaintiff for the limited purpose of settlement discussions. ECF 48. And, on January 23, 2018, he scheduled a settlement conference for April of 2018. ECF 52; ECF 54.

On March 15, 2018, Archer Western filed a status report (ECF 53), stating that the parties had reached a settlement. Accordingly, the next day, Judge Copperthite canceled the settlement conference that had been scheduled for April 17, 2018. ECF 54. However, on March 23, 2018, Archer Western filed another status report (ECF 55), claiming that Turner withdrew his acceptance of Archer Western's settlement offer. Turner filed correspondence with the Court on March 26, 2018, expressing his desire to represent himself. ECF 57. He also filed correspondence on April 6, 2018. ECF 59.

Then, on April 6, 2018, Archer Western filed its first motion to enforce the settlement agreement between the parties (ECF 60), supported by a memorandum (ECF 60-1) and several exhibits. ECF 60-2 to ECF 60-7. In this motion, Archer Western claimed that the parties had entered a binding settlement. ECF 60-1 at 4. On April 12, 2019, because the settlement conference had been canceled, appointed counsel for plaintiff filed a "Motion To Withdraw As Counsel." ECF 61. It was supported by several exhibits. ECF 61-2 to ECF 61-6.

By Order of May 17, 2018 (ECF 71), Judge Copperthite granted appointed counsel's motion to withdraw. But, he denied Archer Western's first motion to enforce settlement, because Turner had withdrawn "his acceptance of settlement before meeting all of the conditions

required for a valid settlement." *Id.* In particular, it appears that settlement documents were never executed by Turner.

Meanwhile, on April 16, 2018, Archer Western moved for summary judgment under Fed. R. Civ. P. 56. ECF 62. Its motion was supported by a memorandum of law (ECF 62-1) and over 300 pages of exhibits. ECF 62-2 to ECF 62-9. Plaintiff opposed the summary judgment motion (ECF 64) and filed two supplements. ECF 65; ECF 66. Defendant replied. ECF 67. Thereafter, plaintiff filed four supplements. ECF 68; ECF 69; ECF 70; ECF 73.

By Memorandum (ECF 74) and Order of January 7, 2019 (ECF 75), I granted in part and denied in part Archer Western's summary judgment motion. Specifically, I granted summary judgment as to Turner's claim that Archer Western's spraying of "hazardous chemicals" caused Turner to sustain medical problems. In this regard, I note that Turner did not have an expert witness as to proximate cause and was, in my view, unable to establish a causal relationship between the alleged exposure and his medical problems. ECF 74 at 12. But, I denied summary judgment as to Turner's claim that defendant had damaged his vehicles. As a result, Turner's only remaining claim is one for property damage. According to Turner, he received a copy of the Memorandum and Order in the mail by January 11, 2019.

On January 28, 2019, Turner filed correspondence with the Court, in which he claims that he was "trick[ed]" by Archer Western into signing a settlement agreement. ECF 77. Further, he asserts that Archer Western "destroyed [his] health." *Id.* On January 30, 2019, Archer Western filed a status report (ECF 78), to which it attached a copy of an undated stipulation of dismissal that was signed by Turner and counsel for Archer Western. ECF 78-1. Moreover, in the status report, counsel claimed that Turner signed and executed the settlement documents, and he then

mailed them to counsel. But, Turner subsequently left a voicemail message for counsel, stating that he was no longer interested in the settlement. ECF 78.

## B. Factual Summary[4]

At the Motion hearing, Aman Aulakh, Esq. testified that he has been a member of the Maryland bar since 2013. Aulakh also testified that, at all times relevant to this case, there were only two men in Mintzer's Maryland office: Aulakh and George Dean Bogris, Esq., who serves as lead counsel for Archer Western in this case.

Aulakh recalled that on January 11, 2019, he contacted plaintiff by telephone to discuss the settlement of Turner's property claim in regard to damage to Turner's two vehicles. During the call, Aulakh told Turner that the Court dismissed Turner's health claim, but not his property claim. Aulakh, on behalf of defendant, offered to settle Turner's property claim for $8,968.42. This figure represents the precise claim asserted by Turner for damage to his vehicles. That sum corresponds to the estimate obtained by Turner from Maaco Collision Repair & Auto Painting to repaint his vehicles. *See* ECF 2-1 at 1-2.

Aulakh explained that he did not provide legal advice to Turner, nor did Turner seek legal advice from Aulakh. Moreover, they did not discuss Turner's right to appeal the disposition of the summary judgment motion as to Turner's medical claim. However, Aulakh testified that Turner gave no indication that he did not understand the Court's ruling on the summary judgment motion. To the contrary, Turner said that he disagreed with the ruling.

Notably, Aulakh testified that Turner accepted the settlement offer. In response, Aulakh told Turner that Archer Western would not pay Turner until Turner signed and returned a general

---

[4] The Court does not have a transcript of the proceeding. Therefore, I have relied on my notes. To the extent that I use quotations, I cannot verify that they are precisely accurate.

release and a stipulation of dismissal. Accordingly, Aulakh mailed Turner the settlement documents to execute in order to finalize the parties' settlement agreement. *See* ECF 79-5.

On January 24, 2019, Aulakh called Turner on the telephone and asked Turner whether he had signed the settlement documents. Turner did not raise any concerns about the settlement documents. Rather, Turner indicated that he had signed and mailed them.

Notably, the envelope in which Turner mailed the documents is postmarked January 23, 2019, which is also the date Turner executed the general release. *See* ECF 79-6 at 4-5. And, Turner also took the time to have the release notarized. *Id.* at 4.

But, on the morning of January 25, 2019, Aulakh received a voice message from Turner, stating that he was no longer interested in the settlement and directing Archer Western not to take any actions regarding the settlement documents. *Id.* That afternoon, Aulakh received the settlement agreement documents in the mail. They were fully signed, executed, and notarized.

Turner testified that he is in severe pain, has rashes on his body, and suffers with blurry vision. He also testified that he completed high school and, at the relevant time, was not taking any medications that affected his comprehension.

Plaintiff acknowledged in his testimony that he had agreed to settle the suit during a phone call with an attorney for Archer Western. He also acknowledged that he signed the settlement documents and mailed them back to counsel for Archer Western. And, he acknowledged that, after he mailed the settlement documents, he left a voice message for counsel for Archer Western, seeking to withdraw from the settlement.

However, Turner maintained that he never spoke either with Aulakh or Bogris. Rather, he insisted that he spoke with another attorney for Archer Western, whom he met at a hearing with

Archer Western in State court.[5] Turner testified that in January 2019, he knew he was speaking to that same attorney because he recognized the attorney's voice. Although Turner stated that he spoke with this attorney on at least two occasions, he did not know the attorney's name. But, he described the attorney as a "pure white," "heavy set" man with a "little beard" and "glasses."

Borgis, a white man with no beard, represented that he was the attorney that Turner met at the State court hearing. He also explained that Turner may not have recognized him because he has lost about 35 pounds since meeting Turner at the State court hearing.

In any event, it is noteworthy that Turner corroborated the critical portions of Aulakah's testimony. Further, Aulakh was quite credible, with no reason to claim that he spoke to Turner if, in fact, another lawyer at the Firm had done so. Regardless, whether Turner spoke with Aulakh or some other lawyer at the Firm is largely a red herring.

The Court recognizes that Turner is clearly disappointed and frustrated by the Court's summary judgment ruling as to his health claim, and by defendant's refusal to compensate him for his medical problems. Because the settlement agreement does not do so, Turner now believes that he was "tricked" into signing it. However, as Turner acknowledged, Archer Western has consistently refused to compensate Turner for his health problems.

## II. Standard of Review

A district court has "inherent authority deriving from [its] equity power, to enforce settlement agreements." *Hensley v. Alcon Labs, Inc.*, 277 F.3d 535, 540 (4th Cir. 2002); *see Williams v. Prof'l Transp., Inc.*, 388 F.3d 127, 131-32 (4th Cir. 2004). However, "[i]f there is a factual dispute over the existence of an agreement . . . or over the agreement's terms, the district court may not enforce a settlement agreement *summarily*." *Hensley*, 277 F.3d at 541 (emphasis

---

[5] This case was removed to federal court in August 2017. So, the hearing would have taken place prior to August 2017.

in original). Rather, "when such factual disputes arise, the court must 'conduct a plenary evidentiary hearing in order to resolve that dispute' and make findings on the issues in dispute." *Id.* (citing *Millner v. Norfolk & W. Ry. Co.*, 643 F.2d 1005, 1009 (4th Cir. 1981).

A "'court must first ascertain whether the parties have in fact agreed to settle, and then discern the terms of that settlement.'" *Copeland v. Dapkute*, PWG-17-cv-1566, 2018 WL 5619672, at *4 (D. Md. Oct. 30, 2018) (quoting *Power Servs., Inc. v. MCI Constructors, Inc.*, 36 F. App'x 123, 125 (4th Cir. 2002) (per curiam)) (internal citation omitted).

In *Swift v. Frontier Airlines, Inc.*, 636 F. App'x 153 (4th Cir. 2016) (per curiam), the Fourth Circuit outlined a district court's obligations for reviewing a motion to enforce a settlement agreement. It said, *id.* at 156:

> If there is a substantial factual dispute over either the agreement's existence or its terms, then the district court must hold an evidentiary hearing. If, however, a settlement agreement exists and its terms and conditions can be determined, as long as the excuse for nonperformance is comparatively unsubstantial, the court may enforce the agreement summarily

*See also Copeland*, 2018 WL 5619672, at *4 n.5.

In an action based upon diversity of citizenship, a federal court must apply the substantive law of the state in which it sits, including that state's choice of law rules. *Klaxon Co. v. Stentor Elect. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). In a contract claim, Maryland courts follow the rule of *lex loci contractus*, applying the substantive law of the state where the contract was formed, unless there is a choice-of-law provision in the contract. *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 925 A.2d 636, 648-49 (2007); *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *see also Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015); *Lewis v. Waletzky*, 422 Md. 647, 657 n.8, 31 A.3d 123,

129 n.8 (2011). As the relevant events occurred in Maryland and the settlement agreement was formed in Maryland, I will apply Maryland law.

"Motions to enforce settlement agreements draw upon standard contract principles." *Bradley v. Am. Household Inc.*, 378 F.3d 373, 380 (4th Cir. 2004); *see Lopez v. XTEL Const. Grp., LLC*, 796 F. Supp. 2d 693, 699 (D. Md. 2011). Indeed, under Maryland law, a settlement agreement "is a contract between two parties which is conditioned upon the court's acceptance of its terms." *In re Blessen H.*, 392 Md. 684, 715 n.6, 898 A.2d 980, 999 n.6 (2006). Thus, "'[s]ettlement agreements are enforceable as independent contracts, subject to the same general rules of construction that apply to other contracts,'" and, "'[a]s long as the basic requirements to form a contract are present, there is no reason to treat such a settlement agreement differently than other contracts which are binding.'" *Erie Ins. Exchange v. Estate of Reeside*, 200 Md. App. 453, 461, 28 A.3d 54, 58 (2011) (citations and some internal quotation marks omitted); *see Copeland*, 2018 WL 5619672, at *5 (quoting *Hayward v. Brown*, PWG-15-3381, 2017 WL 2117364, at *2 (D. Md. May 16, 2017), *aff'd*, 696 F. App'x 102 (4th Cir. 2017) (per curiam) (internal quotation omitted).

In Maryland, "settlement agreements are desirable and should be binding and enforceable." *Chernick v. Chernick*, 327 Md. 470, 481, 610 A.2d 770, 775 (1992). "The policy of encouraging settlement is so important that, even when the parties later discover that the settlement may have been based on a [unilateral] mistake, settlement agreements will not be disturbed." *Nationwide Mut. Ins. Co. v. Voland*, 103 Md. App. 225, 237, 653 A.2d 484, 491 (1995). Of particular relevance here, "[h]aving second thoughts about the results of a valid settlement agreement does not justify setting aside an otherwise valid agreement." *Hensley*, 277 F.3d at 540 (internal citations omitted); *see Lopez*, 796 F. Supp. 2d at 699.

To the extent that the issue is governed by federal law rather than Maryland law, federal decisions are to similar effect. In *Ohio Valley Envir. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 211 (4th Cir. 2009), for example, the Court said: "Settlement agreements operate on contract principles, and thus the preclusive effect of a settlement agreement 'should be measured by the intent of the parties.'" (Citation omitted); *see also Hensley v. Alcon Labs., Inc.*, 277 F.3d 535, 540 (4th Cir. 2002) (stating that "resolution of a motion to enforce a settlement agreement draws on standard contract principles," although "it may be accomplished within the context of the underlying litigation without the need for a new complaint").

### III. Discussion

#### A. Principles of Contract Construction

In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." RICHARD A. LORD, 1 WILLISTON ON CONTRACTS § 1:1, at 2-3 (4th ed. 1990); *accord* Restatement (Second) Contracts § 1, at 5 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421-22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006). Of relvance here, "'[a] contract is formed when an unrevoked offer made by one person is accepted by another.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's County v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)). Thus, mutual assent is an integral component of every contract. *See, e.g., Joseph Saveri Law Firm Inc. v. Michael E. Criden, P.A.*, 759 Fed. Appx. 170 (4th Cir. 2019) (recognizing as a "bedrock principle of law" that an offeree must accept an offer to form a contract); *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).

In determining whether there is an enforceable contract, a court begins the analysis by considering "the essential prerequisite of mutual assent to the formation of a contract . . . ." *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015); *see also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'" (citations omitted)). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

A contract may be oral or written, as well as express or implied. "'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing.'" *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Cty. Comm'rs of Caroline Cty v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000)). Whether oral or written, a contract must express with certainty the nature and extent of the parties' obligations and the essential terms of the agreement. *Forty W. Builders*, 178 Md. App. at 377-78, 941 A.2d at 1209-10; *see Canaras v. Lift Truck Services*, 272 Md. 337, 346, 322 A.2d 866, 871 (1974). If an agreement omits an important term, or is otherwise too vague or indefinite with respect to an essential term, it is not enforceable. *Mogavero v. Silverstein*, 142 Md. App. 259, 272, 790 A.2d 43, 51 (2002); *see L & L Corp. v. Ammendale*, 248 Md. 380, 385, 236 A.2d 734, 737 (1967); *Schloss v. Davis*, 213 Md. 119, 123, 131 A.2d 287, 290 (1956) (stating that a "contract may be so vague and uncertain as to price or amount as to be unenforceable").

"'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted). To determine the parties' intention, courts look first to the written language of the contract. *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006) ("[G]enerally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement."); *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("[T]he court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated."), *aff'd*, 346 Md. 122, 695 A.2d 153 (1997).

Under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017). "Maryland courts interpreting written contracts have long abided by the law of objective contract interpretation, which specifies that 'clear and unambiguous language' in an agreement 'will not give way to what the parties thought the agreement meant or was intended to mean.'" *Urban Growth Prop. Ltd. P'ship v. One W. Balt. St. Assocs. LLC*, No. 882, Sept. Term, 2015, 2017 WL 526559, at *5 (Md. Ct. Spec. App. Feb. 9, 2017) (citation omitted) (unpublished); *see Cochran*, 398 Md. at 16, 919 A.2d at 709; *Huggins v. Huggins & Harrison,*

*Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014) (internal quotations and alteration omitted).

The court's "task, therefore, when interpreting a contract, is not to discern the actual mindset of the parties at the time of the agreement." *Dumbarton*, 434 Md. at 52, 73 A.3d at 232. Rather, the court is to "'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Id.* (quoting *Gen. Motors Acceptance v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)).
Validity of the Settlement Agreement

### B.  Validity of the Settlement Agreement

It is undisputed that Turner signed and executed the general release and the stipulation of dismissal. Both sides also agree that Turner had the general release notarized. And, it is clear that Turner mailed the settlement documents to Archer Western *before* he called to revoke his acceptance. However, before Archer Western physically received the settlement documents, Turner contacted Archer Western and left a voicemail phone message, indicating he changed his mind and no longer wanted to proceed with the settlement. However, that call did not undo the deal.

Maryland follows the common law rule often known as the "mailbox rule" to determine precisely when an offer was accepted and, by extension, when a contract was formed. *U.S. Life Ins. Co. in City of New York v. Wilson*, 198 Md. App. 452, 477, 18 A.3d 110, 124 (2011). Under this rule, "'the mailed acceptance of an offer is effective when mailed, not when received or acknowledged.'" *Id.* (quoting *Martin v. Gov't Employees Ins. Co.*, 565 N.E.2d 197, 203 (1990)). Accordingly, an "attempt to revoke the acceptance by an overtaking communication is similarly ineffective, even though the revocation is received before the acceptance is received."

RESTATEMENT (SECOND) OF CONTRACTS § 63(c) (1981). Therefore, Turner's voicemail did not negate his acceptance of the settlement agreement.

It is clear, then, that the parties reached a settlement agreement. Nevertheless, Turner claims the settlement agreement was the product of trickery and duress and is therefore void and unenforceable. Turner reasons that he was tricked because, under the settlement agreement, he would not recover for the costs related to his medical problems. This, he claims, would be unfair. Similarly, he suggests that his medical problems amount to duress.

Contracts "may be subject to rescission on a finding of fraud, duress, undue influence, or negligent misrepresentation in their making, and declaratory judgments may be issued determining the validity of such contracts." *Hale v. Hale*, 66 Md. App. 228, 233, 503 A.2d 271, 274, *cert. denied*, 306 Md. 118, 507 A.2d 631 (1986); *accord Tung v. Peters*, AW-09-576, 2009 WL 5206627, at *3 (D. Md. Dec. 23, 2009) (citing *Hale*); W.H. Beach, *Application of Declaratory Judgment Acts to Questions in Respect of Contracts or Alleged Contracts*, 162 A.L.R. 756 (1946) (citing *Hale*). In addition, a contract may be invalidated if it is procedurally and substantively unconscionable. *See Stewart v. Stewart*, 214 Md. App. 458, 478, 76 A.3d 1221, 1232 (2013); *Freedman v. Comcast Corp.*, 190 Md. App. 179, 207-08, 988 A.2d 68 (2010); *see also* 5A Alan J. Jacobs & Mary Babb Morris, *Unconscionable Contracts; Contracts of Adhesion*, M.L.E. § 53 (2019) ("A court may invalidate a contract term as unconscionable if both procedural and substantive unconscionability are present.").

Because plaintiff is self-represented, I shall consider his arguments as if he were seeking rescission based on fraud, negligent misrepresentation, or unconscionability.

### 1. Fraud

Under Maryland law, "'[f]raud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement.'" *Sass v. Andrew,* 152 Md. App. 406, 432, 832 A.2d 247, 261 (2003) (citation omitted). At trial the plaintiff must establish the elements of fraud "by clear and convincing evidence." *Md. Envir. Trust v. Gaynor*, 370 Md. 89, 97, 803 A.2d 512, 516 (2002).

In an action for intentional or fraudulent misrepresentation, which is the garden variety of fraud and is often described simply as "fraud," the plaintiff ordinarily must show:

> 1) that the defendant made a false representation to the plaintiff;
> 2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth;
> 3) that the misrepresentation was made for the purpose of defrauding the plaintiff;
> 4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and
> 5) that the plaintiff suffered compensable injury resulting from the misrepresentation."

*Nails v. S & R, Inc.*, 334 Md. 398, 415, 639 A.2d 660, 668 (1994); *accord Thomas v. Nadel*, 427 Md. 441, 451 n.18, 48 A.3d 276, 282 n.18 (2012); *Gourdine v. Crews*, 405 Md. 722, 758, 955 A.2d 769, 791 (2008); *Sass*, 152 Md. App. at 429, 832 A.2d at 260.

Additionally, "a cause of action for fraud" has "a strict requirement of scienter." *First Union Nat'l Bank v. Steele Software Sys. Corp.*, 154 Md. App. 97, 147, 838 A.2d 404, 433 (2003). "Recovery in a tort action for fraud or deceit in Maryland is based upon a defendant's deliberate intent to deceive." *Id.*; *see VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 704, 715 A.2d 188 (1998); *Sass*, 152 Md. App. at 430, 82 A.2d at 260.

To be actionable, a false representation "must be of a material fact." *Gross v. Sussex, Inc.*, 332 Md. 247, 258, 630 A.2d 1156, 1161 (1993). "A 'material' fact is one on which a reasonable person would rely in making a decision," *Sass*, 152 Md. App. at 430, 832 A.2d at 260, or a fact that "'the maker of the misrepresentation knows . . . [the] recipient is likely to

regard . . . as important.'" *Gross*, 332 Md. at 258, 630 A.2d at 1161 (citation omitted). And, the defendant must "know[ ] that his representation is false" or be "recklessly indifferent in the sense that he knows that he lacks knowledge as to its truth or falsity." *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 232, 652 A.2d 1117 (1995).

"The tort of fraudulent inducement 'means that one has been led by another's guile, surreptitiousness or other form of deceit to enter into an agreement to his detriment.'" *Rozen v. Greenberg*, 165 Md. App. 665, 674, 886 A.2d 924, 929 (2005) (quoting *Sec. Constr. Co. v. Maietta*, 25 Md. App. 303, 307, 334 A.2d 133, 136 (1975)). "In fraudulent inducement cases, a defrauded party may elect between two remedies, which are exclusive." Paul Mark Sandler & James K. Archibald, *Pleading Causes of Action in Maryland* § 3.92, at 346 (5th ed. 2013). "Persons who discover that they have been induced into a contract by fraud must decide, or the law will decide for them, whether unilaterally to rescind the contract or to ratify the contract and seek damages, either affirmatively or by recoupment." *Sonnenberg v. Sec. Mgmt. Corp.*, 325 Md. 117, 127, 599 A.2d 820, 823 (1992).

Turner has not claimed that defendant made a false statement. Nor has he provided any evidence that defendant intentionally misled or beguiled him. His unhappiness with the outcome of his case is not trickery. Accordingly, I conclude that the settlement agreement was not the product of fraud.

### 2. Negligent Misrepresentation

Maryland law provides that "an unintentional 'material misrepresentation of fact . . . may warrant rescission by a Court . . . of a contract induced thereby,'" including a settlement agreement. *Creamer v. Helferstay*, 294 Md. 107, 116, 448 A.2d 332, 337 (1982) (so stating, in context of settlement agreement, but reversing trial court's rescission of settlement agreement

where alleged oral misrepresentation was contradicted by express terms of written contract). However, "rescission will be decreed only upon proof of a justifiable reliance on a material misrepresentation." *Chesapeake Homes, Inc. v. McGrath*, 249 Md. 480, 488, 240 A.2d 245, 249 (1968). And, when "the misrepresentation is made without scienter or fraudulent intent, the element of materiality must be clearly established." *Id.* at 488, 240 A.2d at 250.

The Maryland Court of Appeals has explained, *id.* at 488, 240 A.2d at 249 (quoting *Carozza v. Peacock Land Corp.*, 231 Md. 112, 121, 188 A.2d 917, 921 (1963)):

> "In a business transaction, reliance upon a misrepresentation of fact, intentionally misrepresented or otherwise, is justifiable only if the fact misrepresented is material. A fact is material if its existence or nonexistence is a matter to which a reasonable man would attach importance in determining his choice of action in the transaction, or the maker of the misrepresentation knows that its recipient is likely to regard the fact as important although a reasonable man would not so regard it."

There is no indication that defendant made any misrepresentations to Turner. As Turner acknowledged, Archer Western has consistently offered to pay Turner only for the damage to his vehicles. It never offered to compensate Turner for his health problems. Nor is there any claim that Archer Western misled Turner as to the procedural posture of this suit. Indeed, according to Turner's testimony, he received the Court's Memorandum and Order addressing defendant's summary judgment motion before he received Aulakh's first phone call on January 11, 2019. And, he was well aware that the Court had ruled against him on the medical claim.

There was no evidence of misrepresentation. Turner's entire claim is, in actuality, a claim of frustration with regard to his lack of success as to his health claim.

### 3. Unconscionability

"Maryland contract law on unconscionability contains two components, a procedural and substantive aspect." *Dieng v. College Park Hyundai*, DKC-09-0068, 2009 WL 2096076, at *5 (D. Md. July 9, 2009). "'The prevailing view is that [procedural and substantive

unconscionability] must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability.'" *Ratliff v. CoStar Realty Information, Inc.*, DKC-11-0813, 2011 WL 2680585, at *5 (D. Md. 2011) (quoting *Holloman v. Circuit City Stores, Inc.*, 391 Md. 580, 603, 894 A.2d 547, 561 (2006)) (alteration in *Ratliff*).

In *Carlson v. General Motors Corp.*, 883 F.2d 287, 296 n.12 (4th Cir. 1989), the Fourth Circuit distinguished between procedural and substantive unconscionability:

> Substantive unconscionability involves those one-sided terms of a contract from which a party seeks relief (for instance, "I have the right to cut off one of your child's fingers for each day you are in default"), while procedural unconscionability deals with the process of making a contract—"bargaining naughtiness" (for instance, "Just sign here; the small print on the back is only for our standard form"). Each of these branches of unconscionability has common-law cousins; procedural unconscionability looks much like fraud or duress in contract formation, and substantive unconscionability reminds us of contracts or clauses contrary to public policy or illegal.

(quoting J. White & R. Summers, *Uniform Commercial Code* § 403, at 186 (3d ed. 1988) (footnote omitted)).

Furthermore, "it is well established in Maryland[] that '[a]n unconscionable contract involves extreme unfairness, made evident by (1) one party's lack of meaningful choice, and (2) contractual terms that unreasonably favor the other party.'" *Ohio Learning Centers, LLC v. Sylvan Learning, Inc.*, RDB-10-1932, 2012 WL 1067668, at *7 (D. Md. Mar. 27, 2012) (quoting *Barrie*, 410 Md. at 517, 933 A.2d at 394) (alteration in *Ohio Learning Centers*).

The settlement agreement was a contract, and it was neither procedurally nor substantively unconscionable. Plaintiff completed high school and testified that he was of sound mind when he entered the agreement. Moreover, he even went to the trouble of getting the settlement agreement notarized. Further, as noted, Archer Western has consistently offered to

settle only plaintiff's property claim, and not his claim as to his health problems. There is no indication that Turner did not understand the settlement agreement.

In addition, defense counsel never had any physical interaction with plaintiff; his communications with Turner were entirely by telephone or mail. This is relevant because it certainly reduces the risk of intimidation. Although Turner claims that counsel for the defendant should not have contacted him at all, because he is self-represented, the Court knows of no such rule. Indeed, such a rule would undermine the ability of self-represented parties to enter settlements. Further, it was Turner who said that he preferred to represent himself. *See* ECF 57.

The settlement agreement was not procedurally unconscionable. Moreover, the settlement amount is substantively fair; the settlement corresponded exactly to the amount of property damage claimed by plaintiff―$8,968.42. *See* ECF 2-1 at 1-2.

### IV. Conclusion

In my view, the parties reached a valid and enforceable settlement agreement. This is a case of the proverbial "buyer's remorse." But, I see no legal basis to void the settlement agreement.

An Order follows, consistent with this Memorandum Opinion.

Date: June 19, 2019                                  /s/
                                                              Ellen Lipton Hollander
                                                              United States District Judge